OPINION
This case presents the timely appeal of the decision of the Mahoning County Court of Common Pleas convicting Appellant, Stephen Vrable, of two counts of aggravated murder with firearm specifications and sentencing him to death. For the following reasons, the decision of the trial court is affirmed.
For reasons which will become readily apparent, it is necessary to provide a comprehensive recitation of the facts and procedural history of this case. On April 5, 1989, Michael Aey, victim Susan Clemente's landlord and brother-in-law, went to the apartment occupied by Appellant, Ms. Clemente and their three-year-old daughter, Lisa Clemente, because the monthly rent had not been paid. Neither Ms. Clemente nor Lisa had been seen by family members for approximately four weeks. (Trial Transcript, pp. 184-187). When no one answered the door, Mr. Aey went into the apartment, checking to see whether the three had moved out. He detected the strong smell of cleaning solvents. Upon checking the refrigerator for food, he found the body of Susan Clemente, which had been wrapped in a blanket and stuffed inside. (Trial Transcript, pp. 188-190). As there was no telephone in the apartment, Mr. Aey went home, informed his wife (Susan's sister) about his discovery and then went to the Struthers Police Department. He returned to the apartment with two officers who subsequently discovered the wrapped body of Lisa Clemente in the freezer portion of the refrigerator. (Trial Transcript, pp. 190-191).
Dr. Paul Weiss performed the autopsies and determined that Susan suffered a non-fatal gunshot wound to the face and a fatal shot to the back of her head. (Trial Transcript, pp. 306-308, 312). Dr. Weiss also concluded that Lisa was shot in her left cheek and noted an exit wound in the back of her head. (Trial Transcript, p. 318).
On April 6, 1989, Appellant appeared at the Parma, Ohio Police Department in the company of a priest. Appellant agreed to make a statement to a detective. After being advised of his Miranda
rights, Appellant made an oral and written statement confessing to the crimes. He admitted that on March 3, 1989, he had been drinking beer and was toying with his recently purchased gun. As Ms. Clemente walked past, he shot her, then he shot her again so she wouldn't suffer. Because Lisa was "freaking out" and Appellant assumed that he was going to prison and realized that Lisa no longer had a mother, he decided to shoot her as well. (Suppression Hearing, July 13, 1995, State's Exhibit 1).
After the killings, Appellant wandered from motel to motel in Liberty Township, Ohio, Wheeling, West Virginia and Columbus, Ohio. He eventually returned to the apartment, placed the bodies in the refrigerator/freezer and attempted to clean the blood stains from the floor. On the morning of April 6, 1989, after staying at an Austintown Township motel, he awoke to the news that the bodies were discovered. He then drove to Parma, Ohio, talked to a priest and drove separately with the priest to the police station where he confessed to the crimes. (Trial Transcript, pp. 271, 566-567).
On April 10, 1989, Appellant was indicted for the aggravated murders of Susan and Lisa Clemente under Mahoning County Court of Common Pleas case number 89 CR 202. Each count in the indictment included a firearm specification pursuant to R.C. § 2941.143, as well as a death penalty specification pursuant to R.C. §2929.04(A)(4), alleging that the murders occurred as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.
On May 11, 1989, Appellant's appointed counsel filed a "Motion to Determine Competency", asserting that Appellant's present mental condition rendered him incapable of understanding the nature and objective of the legal proceedings against him or of meaningfully assisting in his own defense. Pursuant to this request, the trial court appointed Dr. A. James Giannini to examine Appellant as to his competency to stand trial and his sanity at the time of the commission of the offense. The record reflects that Dr. Giannini was unable to evaluate Appellant but that his associate, Dr. Brian Sullivan, did conduct an examination (Motion to Withdraw Motion to Determine Competency, Dec. 28, 1989). The conclusion of Dr. Sullivan in his August 7, 1989 report was that Appellant:
 ". . . definitely gives evidence for chemical dependence and I am sure alcohol and drugs helped precipitate the alleged killings. Alcohol and drugs diminished his capacity at the time, but I find no evidence of any other (sic) I feel that he is competent to stand trial (sic). He has the ability to understand the charges against him and assist in his own defense."
After receipt of Dr. Sullivan's report, defense counsel arranged for an independent evaluation by Edwin E. Wagner, Ph.D., which took place on August 24, 1989 at the Mahoning County Jail. Although Dr. Wagner was to evaluate Appellant for a determination as to Appellant's competency to stand trial, his report never specifically addressed this issue with any legal certainty. He did opine, however, that Appellant was, "able to take part in his own defense." (September 5, 1989 Report, p. 4) Due to the inconclusive nature of Dr. Wagner's report and the seemingly contradictory report submitted by Dr. Sullivan, the State of Ohio filed a motion under R.C. § 2945.39(A), which allows evaluation of a defendant's mental condition by no more than three examiners. The State sought the appointment of Nancy Huntsman, a psychologist, to conduct the examination. On January 11, 1990, the motion was sustained.
After clinical interviews lasting approximately three hours, review of the reports prepared by Dr. Sullivan and Dr. Wagner, review of social histories prepared by staff members of the Forensic Psychiatric Center of District Eleven, Inc. and Dr. Giannini's office, as well as a review of police reports and newspaper articles, Dr. Huntsman concluded as follows:
 ". . . Mr. Vrabel, at present, is not competent to stand trial. He does know the charges against him. He does appreciate their seriousness. He does know the fundamental values underlying the criminal justice system. He knows the roles of the various individuals involved in trial. He is unable to control his own behavior adequately to participate in trial.
 "However, Mr. Vrabel is unwillingly and is, at present, unable to work cooperatively with his attorneys in his own defense. In my opinion, this is true for two delusional reasons. First, Mr. Vrabel believes that his attorneys are part of a larger conspiracy. Because of this, he is unwilling to share information relevant to his defense completely. To some extent, this results from an apparently rational motive to be found guilty and executed because of the guilt he feels. However, it is also fostered by a belief that, once he dies, he will be reunited with his victims.
 "In my opinion, these are delusional beliefs which indicate the presence, of a minimum, of a delusional disorder, and, quite possibly, the presence of paranoid schizophrenia.
 "Given the presence of a significant mental illness and the fact that this mental illness makes him unable to work effectively with his attorneys in his own defense, it is my opinion, then, that Mr. Vrabel is not competent to stand trial.
 "It is my opinion, also, that he can be restored to competency within a year, if, treated."
(Sanity evaluation of Nancy J. Huntsman, Ph.D., dated 3-20-90).
On April 10, 1990 the trial court issued an order, based on the reports of Gerald L. Heinbaugh (social history) and Nancy Huntsman (sanity evaluation) and found as follows:
 "1. The Defendant is presently not capable of understanding the nature and objective of the proceedings against him and is not capable of presently assisting in his defense;
2. The Defendant is mentally ill;
 3. There is a substantial probability that the Defendant will become capable of understanding the nature and objective of the proceedings against him and capable of assisting in his defense within one (1) year if he is provided with a course of treatment . . ."
Pursuant to the above findings, Appellant was committed to the Timothy B. Moritz Forensic Center for treatment. On September 18, 1990, the trial court, after review of a psychiatrist's report from the Moritz Center, ordered continued treatment at that facility after finding that Appellant understood the proceedings against him but still could not adequately assist in his own defense. On March 20, 1991, the trial court again ordered continued treatment at the Moritz Center as there was a substantial probability that competency would be restored within a reasonable period of time.
Finally, on July 2, 1991, a successor trial judge, at a continued commitment hearing, found that upon consideration of all the evidence, there was not a substantial probability that the Appellant would be restored to competency within one year with continued treatment. The court ordered that an affidavit be filed pursuant to R.C. § 5122.01 alleging that Appellant was mentally ill and subject to the jurisdiction of the probate court. The indictment was subsequently dismissed. (Transcript, July 2, 1991, Competency Hearing, pp. 3-5).
The next reference to the matter occurred on August 30, 1994, when the Western Reserve Psychiatric Hospital notified the Mahoning County Prosecutor's Office that Appellant was now competent to stand trial and had no active mental illness. As a result, on September 16, 1994, Appellant was reindicted under Mahoning County Court of Common Pleas case number 94 CR 789 on two counts of aggravated murder with death penalty specifications for the deaths of his common law wife and their daughter. (Indictment).
At the initial appearance, a former counsel for Appellant under Case No. 89 CR 202 advised the court that the assignment of counsel was fairly problematic. He advised that Appellant was considering representing himself as he was entitled to do underFaretta v. California (1975), 422 U.S. 806. Appellant also refused to request bail. (Transcript, Initial Appearance, September 20, 1994, p. 3).
Appellant was arraigned on September 27, 1994. Written pleas of not guilty and not guilty by reason of insanity were filed and counsel was appointed. A status hearing was conducted on October 17, 1994. At that hearing, the trial court indicated that the issue of Appellant's competency needed to be resolved. Specifically, the court noted that although the Western Reserve Psychiatric Hospital concluded that Appellant was indeed competent to stand trial, documentation evidencing that conclusion was not properly before the court. (Transcript, October 17, 1994, Hearing, pp. 7-8).
Because competency to stand trial had been raised and by virtue of the fact that Appellant wished to waive his right to counsel, the trial court ordered Appellant to undergo another competency evaluation. (Transcript, October 17, 1994, Hearing, pp. 11-13). Dr. Otto Kausch of the Western Reserve Psychiatric Hospital was appointed to conduct the examination which took place on October 22, 1994.
On November 3, 1994, a competency hearing was held wherein Appellant was permitted to proceed pro se, with appointed counsel acting only in an advisory capacity. At the hearing, Dr. Kausch's competency report was accepted into evidence pursuant to the stipulations by Appellant and the prosecution. Appellant's advisory counsel objected to the report's admissibility but was overruled by the trial court. Dr. Kausch's report indicated that Appellant was competent to stand trial. Kausch's testimony at the hearing was consistent with the conclusions reached in that report. (Report of Dr. Kausch, October 25, 1994; Transcript, November 3, 1994, Competency Hearing p. 8-10).
Dr. Kausch suggested that Appellant was malingering and feigning mental illness in order to currently appear mentally ill. (Id. at p. 26). At the conclusion of Dr. Kausch's testimony, one of Appellant's advisory counsel took the unusual step of calling his co-counsel to the stand. Advisory counsel testified that it was impossible to determine whether Appellant was capable of assisting in his own defense because he had steadfastly refused to cooperate with his attorneys. (Id. at p. 47). Advisory counsel suggested that this refusal alone demonstrated his incompetence to stand trial. (Id.).
Based on the evidence presented at the hearing, the trial judge determined that Appellant was competent to stand trial. In an abundance of caution, however, the trial judge ordered another competency evaluation to take place at the same time as Appellant's mental evaluation scheduled pursuant to his plea of not guilty by reason of insanity. (Id. at p. 52). Dr. Giannini and the Forensic Psychiatric Center of District Eleven, Inc. were ordered to conduct the examination.
The record reflects that Appellant refused to cooperate with either of the court-ordered evaluations. At a status hearing conducted on December 29, 1994, the court, after reviewing Dr. Giannini's report, observed:
 "So the Court in considering what is done here can only conclude that the defendant was uncooperative in the court-ordered examination into his competency and his plea of not guilty by reason of insanity. It appears from the information offered by advisory counsel that the defendant was also uncooperative in the court-ordered examination from the Forensic Center of District 11."
(Transcript, December 29, 1994 Status Hearing. p. 6).
At that hearing the trial court chastised Appellant by stating at page 9:
 "Either you're going to stand by what you've already done or you're going to submit to these reports voluntarily, these reports and examinations voluntarily, or I'm going to put you in the Moritz. . . . But I'm not going to let you go to trial and proceed where there is some question of your competency and some question of whether or not you (sic) were legally insane at the time of the act."
At a subsequent hearing conducted on January 5, 1995 it was ordered that Dr. Giannini and the Forensic Psychiatric Center of Northeast Ohio reevaluate Appellant.
At a hearing on February 7, 1995, Appellant and the State of Ohio stipulated to the reports of Dr. Giannini and the Psychiatric Center. The court again found Appellant competent to stand trial. On March 2, 1995, the trial court held another hearing. At that time, Appellant moved to withdraw his not guilty by reason of insanity plea and be allowed to proceed pro se.
After the trial court engaged in an extensive and exhaustive dialogue with Appellant concerning the consequences of defending this type of case without counsel, Appellant was allowed to execute a written waiver of his plea and waiver of counsel. (Docket Items 33 and 34). Trial was set for March 29, 1995.
On March 21, 1995, the trial court held a hearing to excuse potential jurors. At its conclusion, Appellant made an oral motion to suppress any statements he may have given at the Parma Police Department on April 6, 1989, to either the detectives or Assistant Prosecutor Kenneth Bailey from Mahoning County. (Transcript, March 21, 1995, Hearing, p. 22). The trial court set a date for a suppression hearing and, upon the advisory counsel's motion, ordered that another competency evaluation take place. (Id. at pp. 32-35). Dr. Brian Sullivan was appointed to perform this evaluation.
The suppression hearing was conducted on March 24, 1995. Prior to addressing the issues in the motion to suppress, the competency report of Dr. Sullivan was admitted into evidence by stipulation. (Transcript, March 24, 1995, Suppression Hearing, p. 4-5). Dr. Sullivan again concluded, and the trial court agreed, that Appellant was competent to stand trial. (Id. at 6). Following the testimony of the Parma police detectives and cross-examination by Appellant himself, the court overruled the motion to suppress by way of a journal entry filed March 28, 1995.
On that same day. Appellant filed a new plea of not guilty and not guilty by reason of insanity. While the record before this Court is not entirely clear on the matter, it appears that Appellant reinvoked his right to counsel on the day trial was set to commence. (Transcript, May 12, 1995, Hearing, p. 5). The trial judge continued the trial date to afford the appointed counsel time to prepare. A litany of defense motions were then filed.
By way of a letter dated April 26, 1995, Appellant requested the trial court to remove his court appointed counsel and to permit him to proceed pro se. On May 12, 1995, the trial court held a hearing relative to Appellant's request. The trial court denied this request and stated:
 "In anticipation of the last trial date, umm, when he decided that he wanted trial counsel, I was stuck. Legally, I have to allow him trial counsel before the case began. I'm not going to get stuck again. There has to be, in the administration of justice, an ability to require him to accept trial counsel, and if he wants to try some of his own case or participate in the proceedings and proceed that way, I don't see any problem with that. But I'm not going to allow him to foreclose my options. * * * I agree with you that there is abuse here and [sic] apparent abuse of process. I'm not going to allow that abuse to continue and that motion, Mr. Vrable, is overruled. I'm not going to allow you to terminate anybody. These men are representing you. They are going to continue to represent you. They are going to prepare this case for trial. You can prepare your case for trial too. You can work with them or independent of them, and on the judgment day, if you will, if you choose to proceed on your own, fine, be ready to proceed on your own."
(Transcript, May 12, 1995, Hearing, pp. 8-10).
At the conclusion of this hearing, the trial court inquired into Appellant's most recent plea of not guilty by reason of insanity. The court noted that Appellant had been ordered to submit to an evaluation by Dr. Stanley Palumbo, but that Appellant had failed to cooperate. In that regard, the trial court warned Appellant that the affirmative defense of not guilty by reason of insanity may be foreclosed if he failed to cooperate with the court-ordered evaluation. The court noted that it would make arrangements with the Timothy B. Moritz Center to conduct an in-patient mental evaluation if necessary.
On August 10, 1995, there was a hearing on Appellant's plea of not guilty by reason of insanity. As it was apparent that Appellant was willing to cooperate with competency examiners, the court ordered a further mental examination, noting however that the trial would go forward on September 11, 1995, as scheduled. The court ordered the parties to agree on a doctor to examine Appellant. Dr. Douglas C. Darnall, a clinical psychologist, was selected and performed the evaluation on August 18, 1995. Dr. A. James Giannini was also agreed upon and he examined Appellant on August 23, 1995.
On September 5, 1995, a status hearing on Appellant's not guilty by reason of insanity plea was held. At this hearing, Dr. Darnall's report was submitted and accepted into evidence. The report of Dr. Darnall indicated that Appellant was capable of assisting in his own defense and that Appellant understood the nature of the charges against him. (Report of Dr. Darnall, August 29, 1995).
Dr. A. James Giannini also submitted a report that indicated that Appellant was capable of understanding the wrongness and consequences of his alleged crime and was capable of participating meaningfully in his own defense. (Report of Dr. Giannini, August 24, 1995, p. 3). Dr. Giannini supplemented his report with a statement that at the time of the alleged crime, Mr. Vrabel knew the difference between right and wrong, knew the consequences of his act and could refrain from its commission.
As. Dr. Giannini's report was not submitted in a standard defense plea format, the court was to schedule a separate hearing to confirm that the examination for insanity was conducted. That hearing was conducted on September 7, 1995 and Dr. Giannini testified that his examination was made pursuant to the not guilty by reason of insanity plea and was not limited only to an evaluation of Appellant's competency to stand trial. (Transcript, September 7, 1995, Hearing, pp. 5-6).
Trial commenced on September 12, 1995. Voir dire took several weeks. A jury was empaneled on September 25, 1995. Trial testimony was presented over several days. Jury instructions were given the morning of October 3, 1995, and later that night the jury returned a verdict finding Appellant guilty on both counts in the indictment. Prior to the return on the verdict, Appellant filed a motion to present no mitigation witnesses other than himself. (Trial Transcript, pp. 1487-1495) After the court satisfied itself that Appellant understood the possible consequences of a failure to present mitigation evidence, the court ordered that Appellant be evaluated by yet another doctor to ascertain Appellant's competency to make such an election. Dr. Robert J. Algaier, M.D. was appointed to conduct this evaluation. After a 90 minute interview, he concluded that Appellant was indeed competent. (Report of Dr. Robert J. Algaier, October 4, 1995, p. 3).
Pursuant to Appellant's request, no mitigation evidence was presented during the penalty phase of the trial. The state presented its exhibits and evidence from the guilt phase of the trial. Although Appellant presented no evidence in mitigation, he did present a brief unsworn statement as follows:
 ". . . And basically what I am saying is there is nothing of a mitigation factor that can outweigh the aggravating circumstances that occurred that most notably of two people's lives being wiped out."
(Transcript, Penalty Phase, October 5, 1995, pp. 90-91).
The jury returned a verdict recommending death on both counts. On October 10, 1995, the trial court followed the jury's recommendation and sentenced Appellant to death on each count. On October 31, 1995, Appellant filed a motion for new trial which was overruled on November 22, 1995. Appellant filed a pro se
appeal on November 6, 1995. Appellant's court appointed appellate counsel filed an appellate brief to this Court on December 30, 1998, asserting thirteen assignments of error.
We will first analyze the issues presented by Appellant's court appointed appellate counsel, but for the sake of clarity we will address them as if Appellant, himself, were proposing them. We will then address Appellant's sole assignment of error filed prose before conducting our own independent review of the record before us.
Appellant's first assignment of error provides:
 "The Trial Court Erred When it Found the Appellant Competent to Stand Trial, T.d. 16, 141, in Violation of the Immunities Specified in U.S. CONST. amend. XIV and OHIO CONST. art. I, §§ 1, 2, 10, and 16."
As the Ohio Supreme Court has observed, "fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." State v. Berry
(1995), 72 Ohio St.3d 354, 359. The test employed to determine if a criminal defendant is, in fact, competent to stand trial was articulated in Dusky v. United States (1960), 362 U.S. 402.
 "The test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him."
 Id. The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains, "sufficient indicia of incompetence," that an inquiry into the defendant's competency is necessary to ensure his right to a fair trial. Berry, supra at 359, quoting Drope v. Missouri
(1975), 420 U.S. 162.
By statute, Ohio recognizes the right of a criminal defendant not to be tried or convicted of a crime while incompetent. R.C. § 2945.37(A) provides in relevant part:
 "In a criminal action in a court of common pleas or municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before trial, the court shall hold a hearing on the issue as provided in this section. If the issue is raised after trial has begun, the court shall hold a hearing on the issue only for good cause shown.
 "A defendant is presumed competent to stand trial, unless it is proved by a preponderance of the evidence in a hearing under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense."
The statute is clear that if the issue of competence is raised prior to trial, the court shall hold a hearing on the matter. The hearing requirement of R.C. § 2945.37 is satisfied where, prior to the commencement of trial, the defendant has been provided with an opportunity to present evidence in his behalf but instead elects to accept the findings contained in the psychiatric report. State v. Rubenstein (1987), 40 Ohio App.3d 57. It is also important to note that the failure to hold a mandatory competency hearing is harmless error when there is no sufficient indicia of incompetence. State v. Bock (1986), 28 Ohio St.3d 108,110.
If, on the other hand, the issue of the defendant's competence is raised during the trial, the decision to hold a hearing on the matter is left within the sound discretion of the trial court.Berry, supra, 72 Ohio St.3d, at 360; State v. Rahman (1986),23 Ohio St.3d 146, 156. In reviewing the lower court's determination of competency, this Court looks at whether the trial court's conclusion was supported by competent, credible evidence. Statev. Williams (1986), 23 Ohio St.3d 16, 19; State v. Hicks (1989),43 Ohio St.3d 72, 79.
In the case before us, Appellant's competency was put in issue both before the trial began as well as after its commencement. On October 17, 1994, the trial court held a hearing on Appellant's motion to represent himself. At this hearing, the trial judge noted on the record that evidence concerning the restoration of Appellant's competence which served as the prelude to Appellant's reindictment was not properly before the court. As such, the trial judge sustained the prosecution's request to have Appellant's competency to stand trial evaluated. (Transcript, October 17, 1994, Hearing). Dr. Otto Kausch was appointed to conduct that competency evaluation.
As earlier stated, at the hearing which took place following this evaluation, Dr. Kausch testified in relevant part as follows:
 "A. I thought that he was rational, and I saw no evidence for mental illness.
 "Q. So you would not say he's mentally ill. Is he mentally retarded?
"A. No.
 "Q. Is he capable of understanding that nature and the objective of the proceedings against him?
"A. Yes.
" —
 "Q. All right. Is the defendant, in your opinion, based on reasonable medical and psychiatric certainty, able to assist in his own defense?
 "A. I believe that he has the capacity to do so, yes, and the willingness to do so."
(Transcript, November 3, 1994, Competency Hearing p. 8-10).
Additionally, Dr. Kausch was questioned at great length by Appellant's advisory counsel as well as Appellant himself. Dr. Krausch consistently maintained that Appellant was fully aware of the nature of the charges brought against him and was perfectly able to assist his attorneys with his defense if he so desired.
The trial court noted at the end of the hearing that another mental evaluation of Appellant was required pursuant to Appellant's plea of not guilty by reason of insanity. The trial judge ordered another competency evaluation to take place at the same time. (Transcript, November 3, 1994, Competency Hearing, p. 52).
The evidence before this Court reveals that Appellant was initially uncooperative with the court-ordered evaluations and consistently maintained his competence. (Transcript, Hearing, December 29, 1994, p. 5). After being warned by the trial judge, Appellant agreed to cooperate with the additional evaluations. Dr. Brian S. Sullivan next evaluated Appellant. Based upon his own evaluation and his review of other evaluation reports, Dr. Sullivan concluded in relevant part:
 "It is my opinion that Mr. Vrable at this time does not suffer from any major mental illness, psychosis, or mood disorder. That does not preclude episodes that might have happened in the past. He is able to understand the charges against him and participate meaningfully in his defense. I believe he is capable of distinguishing right from wrong. I believe he is competent to stand trial. It is certainly possible that he has delusional thoughts that he was able to hide from me; however, if he has enough insight to be able to conceal any delusions that he might have, he would still be competent to stand trial."
(Report of Dr. Sullivan, March 22, 1995). (Emphasis added).
The admissibility of this report was stipulated to by the prosecution as well as by Appellant through his advisory counsel. (Transcript, Hearing, March 24, 1995, pp. 4-5). After Dr. Sullivan's report was received into evidence, the trial court stated:
 "There is a finding, after evaluation and interview after review of all the other reports that are pertinent to this issue under this indictment, a finding that Mr. Vrable is able to understand the charges against him and participate meaningfully in his defense. He's capable of distinguishing right from wrong and is competent to stand trial. That being the only evidence before the Court, it will make a finding that he is competent to stand trial and will proceed against him as provided by law."
(Transcript, Hearing, March 24, 1995, p. 6).
Appellant was examined again by Dr. Darnall. Although it was pursuant to a not guilty by reason of insanity plea, Dr. Darnall specifically found that Appellant was, "capable of working with his attorney and aiding in his defense." (Report of Dr. Darnall, August 29, 1995). This clinical impression was supported by Dr. James Giannini's report which concluded that Appellant, "is fully capable of understanding the wrongness and consequences of his alleged crime and is capable of participating meaningfully in his own defense." Dr. Giannini's impression was subject to cross examination when he testified at a competency hearing held on September 7, 1995.
It is clear from the record before us that the trial judge complied with the mandates of R.C. § 2945.37 before the trial in this matter began. The court ordered a multitude of mental examinations to ensure the competency of Appellant. Hearings were held pursuant to the statute and all parties were given the opportunity to question the doctors who rendered their impressions or to lodge objections as to the admissibility of the doctors' reports.
As noted earlier, R.C. § 2945.37 also provides the basis for a competency evaluation after trial has commenced, "for good cause shown." In this case, Appellant informed the trial court of his intention to present no evidence in mitigation in the event the jury returned a guilty verdict. (Trial Transcript, p. 1487). Immediately after the guilty verdict was rendered, the trial judge held a hearing in chambers regarding Appellant's request. In a lengthy dialogue with Appellant, the trial judge observed that he had no question as to Appellant's competency but wanted Appellant to submit to yet another competency evaluation to ensure that Appellant was competent to waive his right to present mitigating evidence. (Trial transcript, pp. 1487-1498).
Dr. Robert J. Algaier was appointed to conduct this examination. Dr. Algaier concluded in relevant part as follows:
 "This individual knowingly appears to have understanding of court proceedings and in addition has recall and almost quotes verbatim some of the items in the codes discussed . . . Mr. Vrable does not appear to meet criteria or data that suggests presence of a current mental disorder according to the DSMIV. Waiving mitigation with full understanding, possible outcome and implications. This individual reports understanding his rights and request this motion to be approved."
(Report of Dr. Robert J. Algaier. October 4, 1995).
Based upon this competency report and after engaging Appellant in another lengthy discussion concerning the consequences of Appellant's election not to present mitigating evidence, the trial judge satisfied himself as to Appellant's competency. (Trial Transcript, October 3, 1995, pp. 3-80). Again it is clear that the trial court followed the provisions of R.C. §2945.37 when it found that Appellant's decision to present no mitigating evidence coupled with the fact that the issue of competency was raised on numerous occasions constituted good cause for purposes of ordering yet another competency evaluation.
Upon our finding that the trial court followed the statutory requirements from a procedural stand point, we now turn our attention to the competency findings made by the trial judge pursuant to those procedures.
Appellant's counsel suggests that the observable behavior of Appellant should have put the trial court on notice of Appellant's incompetency. Specifically, Appellant's counsel argues that Appellant's unwillingness to assist his attorneys, his sometimes bizarre behavior such as filing cryptic pro se
motions, his decision to present no mitigating evidence and the representations of Appellant's counsel that Appellant was incompetent to be tried, mandated a finding of incompetence by the trial court.
We disagree with counsel. The Supreme Court of Ohio has addressed this issue in a case whose procedural posture was similar to the case at bar. In Berry, supra,72 Ohio St.3d at 360-361, the Court held:
 "At the time the issue of appellant's competency was raised, the trial court was made aware of defense counsel's representations that (1) appellant may have intentionally withheld information regarding a possible motive for the killing, (2) appellant wanted to die and intended to inform the jury of his wishes, (3) appellant had not cooperated in his defense, and (4) appellant's court-appointed psychologist had recently developed `some strong feelings' that there was a possibility that appellant was not sane enough to be executed or to proceed with the mitigation hearing. Additionally, defense counsel informed the court of his belief that appellant was `sick' because appellant had withheld information regarding an alleged motive for the killing. However, we find that none of these matters, taken singularly or together, constitutes sufficient indicia of incompetency raised any doubt as to appellant's competency to stand trial."
As the Berry Court noted, willingness to assist one's own attorney in one's defense is not the test for competency. The proper inquiry looks at the defendant's present ability to so assist. Id. at 362. Moreover, an election to present no evidence whatsoever in mitigation at the sentencing hearing or even an expressed wish for the death penalty, as opposed to a life-long term of imprisonment, does not by itself call Appellant's competency into question. Id. at 361; State v. Tyler (1990),50 Ohio St.3d 24, 29. This Court is also mindful of the holding inState v. Bock (1986), 28 Ohio St.3d 108, where the Court noted that incompetency to stand trial must not be equated with mere mental or emotional instability or even with outright insanity.Id. at 110. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel. Id.
Reviewing the entire record before us and examining the totality of the evidence on the issue of competency, we hold that there was substantial, credible evidence before the trial court to support a finding of competency. As such, this Court will not disturb that finding. As we find no merit in Appellant's first assignment of error, it is accordingly overruled.
Appellant's second assignment of error provides:
 "The Trial Court Erred in Overruling Appellant's Motion for New Trial, T.d., not numbered, Thus Denying the Appellant His Right to a Fair Trial as Guaranteed by OHIO CONST. art. I, §§ 1, 2, and 16, and U.S. CONST. amend. XIV."
Appellant next argues that the trial court's denial of Appellant's motion for a new trial was unconstitutional. The crux of this argument is that Appellant never had a fair trial because he was incompetent to waive counsel or to elect to present no mitigating evidence at the sentencing hearing. As such, counsel argues the trial court committed reversible error by overruling Appellant's motion.
We are not persuaded by this argument. In Ohio, it is well settled that absent a clear showing that the court abused its discretion, a ruling on a motion for a new trial will not be reversed on appeal. State v. Grant (1993), 67 Ohio St.3d 465,480. In State v. Montgomery (1991), 61 Ohio St.3d 410, 413, the court followed established law as to what constitutes an abuse of discretion in holding that, "the term abuse of discretion * * * connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151, 157.See also, State v. Moreland (1990), 50 Ohio St.3d 58; State v.Xie (1992), 62 Ohio St.3d 521.
In State v. Gibson (1976), 45 Ohio St.2d 366, the Supreme Court held that a defendant in a criminal trial has an independent constitutional right to waive counsel and represent himself and that he may proceed in that manner when he knowingly, intelligently, and voluntarily elects to do so. The Court went on to articulate the proper test to determine if that waiver was effective:
 "In order to establish an effective waiver of right to counsel, the trial court must make sufficient inquiry to determine whether defendant fully understands and intelligently relinquishes that right."
The Court then outlined the manner in which to conduct that test by quoting from Von Moltke v. Gillies (1948), 332 U.S. 708,723-724:
 "`To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'"
Gibson, supra, at 377.
The record reflects that upon Appellant's election to proceed to the penalty phase without the assistance of counsel and to present no evidence in mitigation, the trial court engaged Appellant in a lengthy discussion concerning the nature of the charges, the possible punishments that could be imposed and the possible consequences of presenting no mitigating evidence. (Trial Transcript, pp. 1488-1498). Furthermore, the trial court ordered Appellant to be examined again to confirm his competency to make such an election. The report from the doctor who conducted that court-ordered evaluation reported that Appellant was, "fully aware of the current situations and potential consequences and outcome[s]," of his decision to waive counsel and present nothing in mitigation during the penalty phase of the trial. (Report of Dr. Robert. J. Algaier, October 4, 1995).
Based upon our review of the record, it is clear that Appellant was competent to waive counsel and the trial court's conclusion on this issue was supported by a substantial amount of credible evidence. As such, we are unable to say that the trial court's determination was unreasonable, arbitrary or unconscionable. Accordingly, we find that the trial court was within its sound discretion when it overruled Appellant's motion for a new trial and this Court will not disturb that ruling. Finding no merit in Appellant's second assignment of error, it is hereby overruled.
Appellant's third assignment of error provides as follows:
 "The Ohio Death Penalty Laws Violate Both The Ohio And United States Constitutions Because The Statutes Fail to Provide a Meaningful Proportionality Review. U.S. CONST. amend. VIII and XIV; OHIO CONST. art. I, § 1, and 9. The Trial Court, Therefore, Erred in Denying Appellant's Motion to Dismiss the Death Penalty Specifications, T.d. 180; T.d. 236."
Under this assignment of error, Appellant presents a comprehensive historical discussion of the death penalty in the United States. This historical survey concludes with Appellant's analysis of the 1972 United States Supreme Court decision of Furman v. Georgia (1972), 408 U.S. 238, where the Court struck down virtually all death penalty schemes because there was no principled way to distinguish cases in which it was imposed and those in which it was not imposed.
Appellant asserts that Ohio's scheme of comparing capital cases only with other cases where a death sentence was actually imposed is not a fair proportionality review as it does not permit the courts to make a principled distinction between cases where death is imposed and those where it is not.
As a preliminary matter, this Court notes that Appellant's entire third assignment of error rests upon the premise that a proportionality review is constitutionally mandated when a sentence of death is imposed. This simply is not the law. As the United States Supreme Court noted:
 "That some schemes providing proportionality review are constitutional does not mean that such review is indispensable . . . Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement."
Pulley v. Harris (1984), 79 L.Ed.2d 29, 37.
Since a proportionality review is not constitutionally required, Ohio is free to define the scope of any proportionality review that is adopted. State v. Bedford
(1988), 39 Ohio St.3d 122. The proportionality review that has been employed as part of Ohio's overall death penalty system is codified in R.C. § 2929.05. The purpose behind the proportionality review is to ensure that the sentencing authorities do not impose the death penalty in a capricious or arbitrary fashion. State v. Jenkins (1984), 15 Ohio St.3d 164,176. Appellant challenges the manner in which that review is undertaken by arguing that a reviewing court must look outside of its district to other capital cases to examine the proportionality of the sentence in the case before it.
The Ohio Supreme Court has already spoken on this precise issue. In State v. Steffen (1987), 31 Ohio St.3d 111, 123, the Court held:
 "that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed. Thus, a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate."
Appellant next argues that Ohio's proportionality review is fatally defective because R.C. § 2929.03 does not require a jury, when recommending life imprisonment at the penalty phase, to list the mitigating factors it considered in support of its sentencing recommendation. Appellant maintains that by failing to require some statement from the jury as to the mitigating factors found, a meaningful proportionality review is impossible. Again, this approach is not novel. This argument was before the Ohio Supreme Court in Jenkins, supra, where it stated:
 "The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not."
Jenkins, supra, 15 Ohio St.3d at 176. (Emphasis added); see alsoState v. Hill (1996), 75 Ohio St.3d 195; State v. Davis (1991),62 Ohio St.3d 326 (holding that the present scheme of proportionality review is constitutionally sound).
Appellant concludes his third assignment of error by arguing that the death penalty is repugnant to the constitutional prohibition against cruel and unusual punishment because the Ohio statutory scheme for its imposition does not protect against its imposition in an arbitrary and capricious manner. Again, this argument has been decided by the Ohio Supreme Court on numerous occasions.
The independent weighing process at each appellate level of a capital murder case provides the procedural safeguards necessary to prevent an arbitrary and capricious imposition of the death penalty. State v. Wilson (1996), 74 Ohio St.3d 381. Furthermore, the statutory framework currently in place provides the required safeguards to prevent the very type of capricious and arbitrary imposition of the death penalty which would rise to the level of cruel and unusual punishment. State v. Mauer
(1984), 15 Ohio St.3d 239, certiorari denied, 472 U.S. 924. As such, Ohio's death penalty statutes are constitutional. Statev. Williams (1995), 73 Ohio St.3d 153, certiorari denied,516 U.S. 1161; State v. Gilard (1997), 78 Ohio St.3d 548, certioraridenied, 118 S.Ct. 1679.
This Court is absolutely bound by the holdings of the Ohio Supreme Court. No merit is found in Appellant's third assignment of error and it is accordingly overruled.
Appellant's fourth assignment of error provides:
 "The Trial Court Erred When in Overruling Appellant's Motion to Dismiss, T.d. 180, T.d. 236 Because the Ohio Capital Laws, Both as Enacted and as Interpreted, Deny a Capital Defendant Meaningful Appellate Review, an Indispensable Ingredient in Imposing a Death Sentence Consistent with U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 1, 2, 9 and 16."
In this assignment of error, Appellant alleges that Ohio's capital laws deny Appellant a meaningful appellate review. This Court notes that Appellant's lengthy argument on this issue contains merely an allegation that, "the appellate courts of this State have shown a predisposition against carefully following the law when the appellate review of a death sentence is involved," and that the, "Supreme Court of Ohio [has] abandoned rational and unemotional patterns of thought when reviewing death penalty cases." (Appellant's Brief, p. 95).
The role of this Court in reviewing a death penalty case is codified by statute and defined by the Ohio Supreme Court. It is a duty of immense proportions which we undertake with great solemnity. Notwithstanding Appellant's hostile and unsupported assertions to the contrary, this Court reviews the merits of Appellant's argument with principled thought guided by the dictates of the United States and Ohio Constitution as defined by our highest courts.
Appellant's emotionally charged accusations of judicial neglect aside, we turn our attention to the actual issues raised. Appellant alleges that Ohio's system of appellate review is inadequate because improper limits are placed upon mitigation evidence, causing a denial of effective mitigation arguments. Specifically, Appellant cites to the lack of a "mercy" instruction to the jury.
It is important to note that while Appellant now challenges the preclusion of a mercy instruction, Appellant never objected to any of the instructions given to the jury nor did Appellant request a mercy instruction be given by the trial court. The following dialogue between Appellant, his advisory counsel, the prosecution and the trial judge which took place prior to jury deliberation on sentencing is informative as to this issue:
 "THE COURT: We are in chambers out of the hearing of the jury to allow counsel and the defendant to address the Court regarding the charge given to the jury. First of all, for the State of Ohio?
"MR. BAILEY (Prosecution): Your honor, the State is satisfied.
"THE COURT: All right. Counsel for the defendant?
"MR. SCHULTZ: Your honor, we —
 "THE COURT: Well, your lawyers and you know about the charges to the jury. And you should speak, yes. Do you wish to address the Court on the charge?
"MR. SCHULTZ: Yes. We are satisfied with the charge, Judge.
 "THE COURT: And, Mr. Vrable, do you wish to address the Court concerning the charge given?
"THE DEFENDANT: It's fine with me, Your Honor.
(Sentencing Hearing, pp. 114-115).
An appellant's failure to object to jury instructions constitutes a waiver of any claim of error unless the absence of such instruction rises to the level of plain error. State v. Underwood (1983),3 Ohio St.3d 12, syllabus; see also, Crim.R. 30. The plain error rule, which would allow this court to consider errors which were not raised below, should only be invoked with the utmost caution and under exceptional circumstances. State v. Long (1978).53 Ohio St.2d 91.
Those circumstances do not exist here as this issue has been previously addressed by the Ohio Supreme Court in State v.Lorraine (1993), 66 Ohio St.3d 414. In that case, the Court stated:
 "Appellant in his second proposition of law contends that he was denied a fair trial because the trial court refused to instruct the jury concerning mercy and prohibited him from asking the jury to err on the side of mercy.
 "This court has previously considered a similar issue. We held in State v. Jenkins (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus:
 "`The instruction to the jury in the penalty phase of a capital prosecution to exclude consideration of bias, sympathy or prejudice is intended to insure that the sentencing decision is based upon a consideration of the reviewable guidelines fixed by statute as opposed to the individual juror's personal biases or sympathies.'
"* * *
 "Permitting a jury to consider mercy, which is not a mitigating factor and thus irrelevant to sentencing, would violate the well-established principle that the death penalty must not be administered in an arbitrary, capricious or unpredictable manner. Brown, supra, at 541, 107 S.Ct. at 839, 93 L.Ed.2d at 939; Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. The arbitrary result which may occur from a jury's consideration of mercy is the exact reason the General Assembly established the procedure now used in Ohio.
 "R.C. 2929.03(D)(2) provides that `[i]f the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.' (Emphasis added.) This statutory requirement eliminates the subjective state of mind the issue of mercy generally adds to a jury's deliberation.
 "Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors. Appellant's counsel therefore was not allowed to plead for mercy, although he was permitted to plead for appellant's life based upon the statutory mitigating factors. Accordingly, this proposition is not well taken."
Id. at 417-418.
Thus, permitting a jury to consider mercy, which is not a mitigating factor pursuant to the statute, would result in unpredictable and arbitrary impositions of the death penalty.Id. at 417, citing California v. Brown (1987), 479 U.S. 538,541. The arbitrary result which would occur by allowing consideration of such an amorphous non-statutory factor is precisely what the General Assembly sought to prevent when it established the framework currently in place. Id. Likewise, the arbitrary imposition of a death sentence is exactly what Appellant rails against in this assignment of error. As such, Appellant's contention that the trial court erred by not giving a mercy instruction is without merit.
Appellant next challenges Ohio's death penalty statutes by alleging that there is no meaningful appellate review in a capital case because juries are given inadequate guidance when weighing the aggravating and mitigating factors during the sentencing phase. Again this issue has been specifically addressed by the Ohio Supreme Court.
In Jenkins, supra, the Court examined Ohio's death penalty statute in relation to Florida's statutory scheme. The Court noted that the United States Supreme Court had approved Florida's statute which also required the jury to weigh aggravating and mitigating factors when determining the appropriate sentence to be imposed. Specifically, the United States Supreme Court stated:
 "While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of Fuhrman are satisfied when the sentencing authority's discretion is guided by requiring specific factors that argue in favor of or against the imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition."
State v. Jenkins (1985), 15 Ohio St.3d 164, 173, quotingProffitt v. Florida (1976), 428 U.S. 242, 257-258.
It is precisely this system of weighing the mitigating and aggravating statutory factors which stands as a constitutional protection against an arbitrary or capricious imposition of the death penalty. See generally, State v. Wilson (1996), 74 Ohio St.3d 381,certiorari denied, 117 S.Ct. 129. This procedural safeguard, and indeed, the entire statutory framework relating to the imposition of the death penalty, "does not violate theEighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution."Jenkins, supra, 15 Ohio St.3d at 179. As such, the current system of appellate review in Ohio is constitutional. State v.Green (1993), 66 Ohio St.3d 141, 151; see also, State v. Buell
(1986), 22 Ohio St.3d 124.
As we have already stated, it is not within this court's purview to reverse a decision of the Ohio State Supreme Court. Hence, as outlined above, it must be concluded that Appellant's fourth assignment of error in all of its parts is without merit and is accordingly overruled.
In his fifth assignment of error, Appellant alleges:
 "The Trial Court Erred in Denying Appellant's Motion to Dismiss the Death Penalty Specifications, T.d. 180, T.d. 236; and Appellant was Deprived of Liberties under U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 1, 2, 9 and 16 Because the Death Penalty in Ohio is Mandatory under Certain Circumstances."
The main thrust of Appellant's fifth assignment of error is that by precluding a "mercy" instruction to the jury during the sentencing phase of a capital case, the death penalty becomes mandatory when the aggravating factors outweigh the mitigating factors beyond a reasonable doubt.
As noted earlier, this argument fails from a procedural as well as a substantive standpoint. Since Appellant neither requested a mercy instruction nor objected to the instructions that were given, any claimed error in the instructions to the jury are waived. Additionally, the question as to the propriety of a mercy instruction has been previously addressed by this Court in our disposition of Appellant's fourth assignment of error. As such, the issues presented in this assignment of error are without merit and are accordingly overruled.
For his sixth assignment of error, Appellant argues that:
 "Appellant Was Deprived the Effective Assistance of Counsel Under U.S. CONST. amend. VI and VIII and OHIO CONST. art. I, § 1, and § 10."
In this assignment of error Appellant asserts that he was denied the effective assistance of counsel due to counsel's failure to challenge for cause potential jurors who purportedly expressed bias against Appellant during the voir dire stage of Appellant's trial. Appellant also alleges that counsel was ineffective in presenting additional evidence of Appellant's asserted incompetence before the trial court and that Ohio's death penalty statute operates as a per se violation of Appellant's right to effective counsel.
Appellant correctly notes that the guidelines for determining effective assistance of counsel were set forth by the United States Supreme Court in Strickland v. Washington (1984),466 U.S. 668 when it held:
 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose results are reliable."
Id. at 687.
Thus, a claim of ineffective assistance of counsel requires that the defendant, "identify the acts or omissions of counsel" that allegedly rise to the level of ineffective assistance and demonstrate that those acts or omissions were not, "the result of reasonable, professional judgment." Id. at 680. Furthermore, there must be a showing, within a reasonable degree of probability, that but for counsel's ineffective assistance the result of the proceedings would have been different. Id. at 694. Reasonable probability is defined as a probability sufficient to undermine confidence in the outcome of the trial.Id. Finally, there is a strong presumption in favor of finding that counsel rendered adequate assistance and exercised, "reasonable professional judgment." Id. at 690. In State v.Thompson (1987), 33 Ohio St.3d 1. the Ohio Supreme Court adopted the Strickland test.
As each of Appellant's arguments concerning ineffective assistance of counsel requires a separate analysis, they shall be addressed in turn in light of the legal standards set forth above.
A. Assistance of Counsel During Voir Dire.
Appellant alleges that four potential jurors had expressed various biases against Appellant and that the failure of counsel to challenge them for cause demonstrated ineffective assistance. The standard in challenging a potential juror for cause on the grounds that such potential juror had previously formed opinions is set forth in R.C. § 2945.25(B), which provides as follows:
 "A person called as a juror in a criminal case may be challenged for the following causes:
 "(B) That he is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;"
(Emphasis added).
In support of his argument, Appellant raises four specific instances where he believes a potential juror should have been challenged for cause. Appellant first focuses on Ms. Chambers, who stated that she believed in the death penalty. (Tr. Vol. 4 p. 808), that she had formed an opinion about the guilt of the defendant (Tr. p. 829, 831) and that she would be inclined to impose the death penalty if Appellant was convicted of aggravated murder (Tr. p. 851). Stopping here, Appellant claims these constituted absolute grounds for counsel to challenge for cause.
A further examination of the extensive questioning of Ms. Chambers (Voir Dire Transcript, pp. 786-861) clearly reveals that she stated that she could follow the court's instructions of law (Id., pp. 792, 794, 822); that she could afford the defendant a presumption of innocence (Id., p. 797); and that she would return a verdict of death if aggravating circumstances outweighed mitigating circumstances (Id., p. 818). While she did initially express a belief that Appellant would have to produce evidence to prove his innocence, (Id., pp. 840-841), the court proceeded to instruct her as to the presumption of innocence. At the conclusion of the trial court's tutorial, she stated that she understood and would give the defendant a presumption of innocence (Id., p. 847). With regard to the penalty phase of the trial, she stated as follows at page 852:
 "Q. . . . Now, would you be more inclined to give him the death penalty if you found him guilty of aggravated murder or would you walk into that sentencing phase with an open mind knowing that you have options, that he doesn't have to be put to death just cause he's found guilty of aggravated murder?
 "A. I would walk in with an open mind because I don't take someone's life lightly.
"Q. You sure you can do that?
"A. Yes."
The record on the whole reflects that Ms. Chambers could serve as an impartial juror. Counsel was not ineffective under the Strickland test for failing to challenge her for cause as it is clear that the trial judge was satisfied that she was capable of, "render[ing] an impartial verdict according to the law and the evidence submitted." R.C. § 2945.25(B).
The next juror Appellant suggests should have been challenged for cause is Mr. Craciun, who stated that his ability to be fair about giving the death penalty "may be" impaired because the case involved a child victim. (Voir Dire Transcript, p. 1183). Again, an examination of the remainder of the dialogue not cited by Appellant demonstrates that there were no grounds to challenge Mr. Craciun for cause. Beginning at page 1183 of the voir dire transcript, Mr. Craciun answered the following questions:
 "— The fact that the death penalty is a possible penalty in that case, will that impair your ability or affect your ability to be fair and impartial?
"A. No, sir.
"*****
 "Q. And because a child was a victim in this case would that do anything to impair your ability or feel more strongly about giving death penalty if a guilty verdict is reached in this case?
"A. Maybe.
"Q. And would you tell me why — why would that be?
 "A. I just — children are innocent, you know, and it just doesn't seem right It seems like a more gruesome crime if a child was involved.
 "Q. If we get to that phase and past the first phase, could you set aside that feeling and weigh, as the Judge said, the aggravating factors and mitigating factors?
"A. Yes; yes.
 "Q. Just because a child is a victim you're not going to go in with blinders on and say this guy is guilty and he gets the death penalty?
"A. No."
Clearly, Mr. Craciun indicated a present ability to be fair and impartial. Thus, there was no ability to challenge for cause.
Appellant next claims that the failure of defense counsel to question Mr. Pusch as to whether he would prefer that the death penalty be imposed if Appellant was convicted demonstrates ineffective assistance of counsel.
This assertion is without merit as Mr. Pusch testified that he would be able to follow the court's instructions in the penalty phase. At page 1351 of the voir dire transcript the following dialogue occurs:
 "Q. And will you also be willing to make a decision that — in this matter there are certain aggravating circumstances and mitigating factors. During the second phase of the trial the State of Ohio will put on the aggravating circumstances, why we feel that the death penalty is a proper punishment. The defense of course is going to put on mitigating factors which tell you why the death penalty is not a proper punishment. If the Judge instructs you that if you find the aggravating circumstances outweigh the mitigating factors that your decision must be the death penalty could you follow that instruction?
"MR. GAINS: Objection.
 "THE COURT: The objection is sustained. The question is incomplete because that finding would have to be a finding that's made by the burden of proof beyond a reasonable doubt: that is the aggravating circumstances would have to outweigh the mitigating factors by proof beyond a reasonable doubt. Is that what your objection is?
"MR. GAINS: Yes, Your Honor.
"THE COURT: Do you understand what the question is now?
"MR. PUSCH: Yes.
"THE COURT: Can you answer it?
"A. I think I would be able to."
Although the defense team did not pose the specific question, the entire examination revealed that Mr. Pusch would follow the court's instructions regarding the death penalty. Moreover, this Court recognizes that voir dire is largely a matter of strategy and tactics and counsel was in a far better position to determine whether this or any other juror merited a more in-depth examination. See, State v. Phillips (1995),74 Ohio St.3d 72, 85.
Lastly, Appellant asserts ineffective voir dire assistance in counsel's failure to challenge Mr. Powers for cause after learning he may have formed an opinion as to Appellant's guilt. (Voir Dire Transcript, p. 1663). This contention is equally without merit, as Mr. Powers qualified his position by noting that, although he had opinions on matters, he was perfectly able to render a verdict based on the evidence presented during the trial:
 "Q. Okay. But can you follow the Court's instructions? Because the law says that Stephen Vrabel starts with a clean slate and that the opinions that you formed must only be based on what you see and hear in this courtroom?
"A. I can form opinions based on what is said in this courtroom.
"* * *
 "Q. Let me ask this question: If you're sitting there in juror number one's chair or in the jury room, we're going to vote right now, is Stephen guilty or innocent, what would your vote be right now?
"A. Right now it would have to be not guilty.
"Q. Why?
"A. Because I do not have any solid evidence."
This demonstrates Mr. Power's ability to remain neutral. and form a judgment only on the evidence presented at trial. In addition, while Mr. Powers admitted a conservative view that the death penalty was a deterrent to crime and that his view of the death penalty has actually weakened over the years because of the delays in imposition of the penalty, he clearly stated that he could follow the rules of court (Id., p. 1674), set aside his opinions and make a judgment based on the evidence presented. (Id., p. 1656).
As there were no recognized grounds to challenge these potential jurors for cause, any claim of ineffective assistance of counsel for failing to do so is baseless. Our review of the relevant transcripts reveals that the failure to question a potential juror regarding their personal inclination whether to impose the death penalty was within the realm of acceptable trial tactics or strategy and thus, did not substantiate a claim of ineffective assistance.
B. Failure to Present Additional Evidence of Incompetency
Appellant next argues that trial counsel was ineffective by failing to present additional lay evidence regarding Appellant's purported incompetence to stand trial. As we have previously found that the trial court properly held Appellant to be competent to stand trial based on the same evidence eluded to by Appellant, there is no merit presented in this issue.
 C. Ohio's Death Penalty Statute Operates as a per se Violation of Appellant's Right to Effective Counsel.
Appellant next claims that Ohio's death penalty statute, by its terms, operates to prevent the effective assistance of counsel. Appellant contends that the procedure used to "death qualify" a jury presents a "Hobson's choice". Specifically, Appellant contends that he had a choice in voir dire to either ask potential jurors about their inclination to impose the death penalty, thereby undercutting his presumption of innocence, or to abstain from questioning jurors on this issue, taking the risk that he will fail to uncover some bias in favor of imposing death. The premise for his ineffective assistance argument is that the statute makes it impossible for the trial counsel to achieve an impartial jury.
This Court is not persuaded by this argument. We must note that the federal constitution does not prohibit states from "death qualifying" juries. Lockart v. McCree (1986),476 U.S. 162. Additionally, the Ohio Supreme Court has already held that death-qualifying a jury, "does not deny a capital defendant a trial by an impartial jury." State v. Dunlap (1995), 73 Ohio St.3d 308,certiorari denied, 516 U.S. 1096, quoting, State v.Jenkins (1984), 15 Ohio St.3d 164, paragraph two of the syllabus; citing, Lockhart, supra. As this issue has previously been decided by the Ohio Supreme Court, we find no merit in Appellant's arguments, here, and Appellant's sixth assignment of error is accordingly overruled.
In his seventh assignment of error, Appellant argues that:
 "The Trial Court Erred in Denying Appellant's Motion to Dismiss the Death Specifications, T.d. 180, T.d. 236; and, Accordingly, Appellant Was Deprived of Due Process, The Ability to Remain Free of Cruel and Unusual Punishment, and the Ability to Defend Life, Because the Death Penalty Specification Is Overbroad. U.S. CONST. amend. VIII and XIV; OHIO CONST. art. I, §§ 1, 9, and 16."
In his seventh assignment, Appellant argues that what he refers to as the "mass murder" specification found in R.C. § 2929.04(A), which allows the imposition of death where the defendant is found guilty of the purposeful killing of two or more individuals is constitutionally overbroad because it is conceivable that there are certain circumstances where a defendant's actions may result in the death of two people but where both deaths do not, technically, rise to the level of aggravated murders. Once again, Appellant's specific argument as to this issue has been previously addressed by the Ohio Supreme Court and we are bound to follow the rulings of that Court.
In State v. Brenner (1987), 40 Ohio St.3d 301, 310, the Court held:
 "* * * it is clear that no one could reasonably believe that every murder is `part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.' Thus, we find that the specification in R.C. 2929.04(A)(5) does not give the sentencing court the wide discretion condemned in both Godfrey and Maynard. Therefore, we hold that the course-of-conduct specification is not void for vagueness under either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution. The language of the statute is definitive and is circumscribed to cover only those situations which it fairly describes."
 See e.g., State v. Maurer (1984), 15 Ohio St.3d 239 (Ohio's capital sentencing scheme does not violate the Eighth orFourteenth Amendments of the U.S. Constitution or any provision of the Ohio Constitution), certiorari denied, 472 U.S. 1032;State v. Brewer (1990), 48 Ohio St.3d 50 (Ohio's capital punishment scheme is constitutional), certiorari denied,116 S.Ct. 101.
Furthermore, it is clear from the facts herein and the action of the jury that Appellant was, in fact, found guilty of two aggravated murders and that the specifications he complains of cannot be deemed overbroad under the circumstances here.
As the issues raised by Appellant have been previously ruled upon by the Ohio Supreme Court adversely to Appellant's position, Appellant's seventh assignment of error is overruled.
Appellant's eighth assignment of error provides that:
 "The Trial Court Erred in Permitting the Prosecutor to Admit Certain Photographs as Exhibits, in Both the Guilt, T.p., 951-959 and the Penalty Phases, T.p., Penalty Phase, p. 89, of the Trial, Thereby Denying Appellant the Defendant His Right to Fair Trial Pursuant to U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§ 2, 10, and 16."
Here, Appellant contends that the trial court committed reversible error by admitting into evidence photographs of the murder victims and allowing them to be used as exhibits during both the guilt and the penalty phase of the trial. Appellant contends that the use of these photographs served only to inflame the passions of the jury and served no probative value, thereby denying him a fair trial.
The Supreme Court of Ohio addressed a similar issue inState v. Maurer (1984), 15 Ohio St.3d 239. In Maurer, the Court held that the mere fact a photograph is gruesome is not sufficient to render it per se inadmissible. Id. at 264. The trial court has broad discretion in the admission of evidence, including photographs, and unless it is shown that the trial court "clearly abused its discretion" and that the defendant has been "materially prejudiced thereby," and an appellate court should thus be "slow to interfere." Id.
The same test is employed both at the guilt and the sentencing phase of trial, State v. Burke (1995), 73 Ohio St.3d 399; State v. Smith (1997), 80 Ohio St.3d 89; State v.Wogenstahl (1996), 75 Ohio St.3d 344; State v. Woodard (1993),68 Ohio St.3d 70. This test was refined by the Court in Statev. Morales (1987), 32 Ohio St.3d 252. when it ruled:
 ". . . To be admissible in a capital case, the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature. Contrary to the Evid.R. 403 standard, where the probative value must be minimal and the prejudice great before the evidence may be excluded, pursuant to Maurer, supra, if the probative value does not, in a simple balancing of the relative values, outweigh the danger of prejudice to the defendant, the evidence must be excluded."
Pursuant to Maurer and Morales, Appellant must demonstrate that the trial court clearly abused its discretion in finding that the probative value of the admitted photographs outweighed the prejudicial effect. An abuse of discretion, "* * * connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."State v. Adams (1980), 62 Ohio St.2d 151, 157.
Appellant is unable to demonstrate an abuse of discretion in the trial court because the introduction of photographs, even if gruesome, in the penalty stage is not error and is, in fact, authorized by R.C. § 2929.03(D)(1). This statute provides in part that during the penalty stage, the court and the trial jury shall consider, "* * * any evidence raised at trial that isrelevant to the aggravating circumstances the offender was found guilty of committing * * *." (Emphasis added). In addition, this section provides that the court and the trial jury, "* * * shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing * * *." (Emphasis added). State v. DePew (1988), 38 Ohio St.3d 275, 282.
In the case at bar, the trial court accepted into evidence six photographs and refused six additional photographs offered by the prosecution during the guilt phases of the trial. (Trial Transcript, pp. 951-961). Our review of the record before us reveals that the trial court properly excluded a number of photographs due to their cumulative or repetitive nature and specifically found that the probative value of the excluded photographs was outweighed by their prejudicial effect. Of the photographs that were admitted, the trial court found that they served to corroborate the testimony of state witnesses, illustrated prior calculation and design and cast doubt on Appellant's defense of insanity. (Trial Transcript, pp. 951-961).
As these photographs were probative in the penalty phase of the trial both as regards the aggravating circumstances that the State had the burden of proving and as to the mitigating factors that the State sought to minimize, State v. Eley (1996), 77 Ohio St.3d 174,182, we cannot say that the trial court abused its discretion and must overrule Appellant's eighth assignment of error.
In his ninth assignment of error, Appellant argues that:
 "A Capital Defendant Has a Substantive Right under OHIO CONST., Art. IV, § 5(b), and U.S. CONST. amend. V and VI and XIV to Have Twelve Peremptory Challenges; and the Trial Court Erred When it Denied Appellant Twelve Peremptory Challenges. T.d. 88, 236, U.S. CONST. amend. XIV, OHIO CONST. art. I, §§ 1, 2, and 16. The Trial Court Also Erred When it Required the Exercise of Peremptory Challenges After Passing Only twelve Jurors for Cause, T.d. 274, 278.
In this assignment of error, Appellant argues that a capital defendant has a substantive right under both the federal and Ohio Constitutions to have twelve peremptory challenges and that the trial court erred in permitting only six such challenges. Appellant draws our attention to R.C. § 2945.21(A)(2) which provides for twelve peremptory challenges in capital cases and argues that a substantive right has been created. Appellant then argues that Crim.R. 24(C), which only allows for six peremptory challenges, unconstitutionally impairs that right.
Once again, this argument is not novel. The Ohio Supreme Court has previously ruled that there is no federal or state constitutional requirement to provide a criminal defendant with any peremptory challenges. State v. Greer (1988), 39 Ohio St.3d 236,244. While the General Assembly statutorily created a general right to peremptory challenges, courts have authority over their own procedures. These include determining the specific number of challenges to be afforded a defendant. Id.
As such, Crim.R. 24(C), which provides for six peremptory challenges does not violate any portion of the Ohio Constitution. Id. The fact that the trial involves a capital offense does not change the analysis, since capital defendants are not entitled to special treatment regarding evidentiary or procedural rules. State v. Jester (1987), 32 Ohio St.3d 147,150; State v. Jenkins (1984), 15 Ohio St.3d 164, 226.
Appellant next challenges the constitutionality of the requirement that he exercise his peremptory challenges after voir dire examination of only twelve jurors. Appellant claims that he has a substantive right in voir dire to question at least thirty-two jurors before exercising his peremptory challenges. We must disagree, as we have earlier discussed the fact that the Ohio Supreme Court has ruled on the viability of Crim.R. 24. Greer, supra.
For the reasons stated above, Appellant's ninth assignment of error is without merit and is accordingly overruled.
In his tenth assignment of error, Appellant argues that:
 "The Trial Court Erred in Overruling Appellant's Motion to Dismiss the Death Penalty Specifications, T.d. 180, T.d. 236, Because the Ohio Death Penalty Impermissibly Impinges upon the Rights to a Jury Trial and to Be Free from Self-incrimination."
Appellant asserts that Ohio's death penalty statute encourages guilty pleas and therefore violates a myriad of federal and state constitutional provisions. As Appellant did not plead guilty to the charges brought against him and this case was resolved after a trial by jury, the issues presented by this assignment of error serve only as an invitation to this Court to engage in an analysis of an entirely hypothetical scenario. See State v.Johnson (1988). 43 Ohio App.3d 1. This we decline to do and must summarily overrule this assignment.
Appellant's eleventh assignment of error provides as follows:
 "The Trial Court Erred in Refusing to Dismiss the Death Penalty Specifications, T.d. 180, 236, Because Ohio's Death Penalty Violates OHIO CONST. art. I, §§ 1, 2, 5, 9, 10, and 16."
In this assignment of error, Appellant again challenges the constitutionality of Ohio's death penalty statute and further alleges that the Ohio Supreme Court has not analyzed the statute in light of the Ohio Constitution. We disagree with Appellant's assertion. In State v. Jenkins, supra, 15 Ohio St.3d at paragraph one of syllabus, the Court clearly and unequivocally held:
 "Ohio's statutory framework for imposition of capital punishment, as adopted by the General Assembly effective October 19, 1981, and in context of the arguments raised herein, does not violate the Eighth and Fourteenth Amendments to the United States Constitution or any provision of the Ohio Constitution."
(Emphasis added).
Appellant next argues that the use of a death-qualified jury results in a jury that is more likely to convict, thus denying him of his constitutional right to a trial by a fair and impartial jury. As noted earlier, however, the Ohio Supreme Court has previously put this argument to rest. In Jenkins, supra,15 Ohio St.3d at 188, the Court held that "death-qualify[ing] a jury prior to the guilt phase of a bifurcated capital prosecution does not deny a capital defendant a trial by an impartial jury." Appellant's suggestion that a capital defendant is entitled to a new jury in the sentencing phase of trial was expressly rejected in State v. Mapes (1985), 19 Ohio St.3d 108 where the Court reasoned:
 "Appellant also argues that the use of the same jury at the guilt and penalty phases of his trial violated his right to trial by a fair and impartial jury and his right to effective assistance of counsel. Appellant argues that the jury did not fairly and impartially view him during the penalty phase because it had convicted him during the guilt phase and that appellant's counsel was not effective during the penalty phase for the same reason. These arguments were also rejected in State v. Jenkins where we stated:
 "`Appellant also submits that since the same jury which convicted him also sentenced him, he was denied a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Sections 10 and 16, Article I of the Ohio Constitution. Appellant illustrates this contention by arguing that if defense counsel pursues a defense at the guilt phase of a capital trial which affects defendant's credibility, then his credibility is diminished at the sentencing stage.
 "Suffice it to say that although the Supreme Court has endorsed bifurcated proceedings in death penalty cases, see Zant v. Stephens, * * * [(1983), ___ U.S. ___, 77 L.Ed.2d 235] at 248, the court has yet to even remotely suggest that the Constitution requires a new jury be selected for the sentencing phase. Accordingly, we are unable to accept appellant's contention.'"
Id. at 116-117. Based on the above, Appellant's argument to the contrary lacks merit.
Appellant's next argument within this assignment challenges the constitutionality of Ohio's method of execution. Specifically, Appellant claims that death by electrocution is a form of cruel and unusual punishment. This argument must fail in light of Statev. Coleman (1989), 45 Ohio St.3d 298 where the Ohio Supreme Court held that, "the death penalty by means of electrocution is not cruel and unusual punishment." Id. at 308. (Emphasis added).
Appellant next asserts that the government must demonstrate that the death penalty is the least restrictive means to accomplish the societal goals promoted by this penalty. Appellant's assertion is overruled upon the authority of the Ohio Supreme Court's decision in State v. Jenks, supra. The Jenkins
Court directly and summarily addressed this very proposition when it observed.
 "Appellant's "least restrictive" argument, however, was rejected over eight years ago when the United States Supreme Court released its decisions in Gregg v. Georgia
(1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; Woodson v. North Carolina
(1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 and Roberts v. Louisiana (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974."
Id. at 168.
For the reasons stated here, Appellant's eleventh assignment of error is overruled in its entirety.
Appellant's twelfth assignment of error asserts that:
 "The Trial Court Erred in Sentencing Appellant to Death Because the Court's Sentence Reflects That the Death Sentence Was Not `Appropriate.' U.S. CONST. amend. VIII
and XIV; OHIO CONST. art. I, §§ 1, 9, and 16."
In this assignment of error, Appellant argues that the trial court must not only determine that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, but also that the trial court must make an additional finding that death is the only appropriate penalty. Appellant suggests that the Ohio Supreme Court's decision in State v. Taylor (1997),78 Ohio St.3d 15 mandates this additional step.
Appellant's reliance on Taylor for this proposition demonstrates a fundamental misunderstanding of the holding in that case. In Taylor, the Court merely stated in dicta that:
 "He (Appellant) failed to ask the trial judge to instruct the jury that "[y]ou are not required to determine unanimously that the death sentence is inappropriate before you consider the life sentences." Brooks, 75 Ohio St.3d at 160, 661 N.E.2d at 1041. Although the instruction appellant now seeks may be a desirable one, its absence was not plain error."
Id. at 29. Additionally, the Court went on to note that:
 "Overall, the trial court clearly instructed the jury that, before recommending death, it must be convinced beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors, and that prosecution had the burden of proof of the issue."
Id. at 30.
The question as to whether a separate finding on the appropriateness of the death penalty is required has been previously answered in the negative. In State v. Grant (1993),67 Ohio St.3d 465, the Court observed that:
 "The court's instructions required the jury to recommend death if the aggravating circumstances outweighed the mitigating factors. The appropriateness of the death penalty is contained in that consideration."
Noting that Ohio law does not require a separate finding as to the appropriateness of the death penalty, we now turn our attention to the instructions given to the jury in the case at bar. Prior to jury deliberation on sentencing, the court instructed the jury as follows:
 "The sentence of death should be imposed only if you find that the State has proved by proof beyond a reasonable doubt that the aggravating circumstances outweighs any and all mitigating factors when the mitigating factors are weighed together and considered in the aggregate."
(Transcript, Sentencing Hearing, p. 102).
This instruction contained a proper statement of the law. Pursuant to Grant, the issue as to the appropriateness of the death penalty is contained within that instruction. Accordingly, Appellant's twelfth assignment of error is hereby overruled.
In his thirteenth and final assignment of error through counsel, Appellant asserts that:
 "The Trial Court Erred in Failing to Dismiss the Death Penalty Specifications Because The Death Penalty Violates U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 1, 2, 9 and 16 Since the Methods of Execution Violate Evolving Standards of Human Decency, an Integral Part of Due Process. T.d. 180, 236."
In this assignment of error, Appellant makes an impassioned argument that the Ohio death penalty is unconstitutional as the means used for execution result in a form of punishment which may only be characterized as cruel and unusual. In support of this position, Appellant has provided this Court with a plethora of examples of "botched" electrocutions carried out in the electric chair.
This question, however, has also already been decided by the Ohio Supreme Court. In State v. Coleman (1989) 45 Ohio St.3d 298,308, the Court stated, "The death penalty by means of electrocution is not cruel and unusual punishment." See e.g.,State v. Brooks (1986), 25 Ohio St.3d 144; State v. Buell (1986),22 Ohio St.3d 124; State v. Jenkins (1984), 15 Ohio St.3d 164.See also, State v. Bayless (1976), 48 Ohio St.2d 73 (holding that the sentence of death by electrocution, for the crime of aggravated murder, does not violate the prohibition of the United States Constitution against cruel and unusual punishment).
As correctly observed by Appellant, Ohio law now provides a defendant sentenced to death with an opportunity to elect to be executed by means of lethal injection rather than the electric chair. R.C. § 2949.22. Appellant notes that the Ohio Supreme Court has not specifically ruled on the constitutionality of this particular means of execution and invites this Court to now rule that R.C. § 2949.22 violates the state and federal prohibitions against cruel and unusual punishment. We must decline to so rule, as we are already bound by Ohio law to find that one of the means of death which can be elected by a defendant is constitutional.
For the reasons expressed above, Appellants thirteenth assignment of error is without merit and is hereby overruled.
On November 7, 1996 Appellant filed a pro se brief listing as an assignment of error the trial court's denial of his request to represent himself during the trial proceedings. Appellant suggests that this denial amounted to a procedural violation of constitutional proportions which requires a reversal of his conviction.
The record before this Court indicates that Appellant had previously exercised his right to self-representation. The trial court permitted him to do so and appointed counsel to serve in an advisory capacity only. Immediately before the trial was to begin, however, Appellant reasserted his right to counsel. This reassertion of his right to counsel caused the trial court to dismiss the jury panel and resulted in a six month delay in the subsequent trial to allow his appointed counsel to prepare for a capital trial.
Although it may be gleaned from the record that Appellant insinuated to the trial court that he was again entertaining thoughts of representing himself, in the more than one-thousand pages of trial transcript we can see that the trial court did everything in its power to discourage this in light of the complexities of capital litigation and the possible sentencing that could be imposed.
As the trial date approached and voir dire examination was underway, Appellant requested the trial court to dismiss his appointed counsel and to permit him to represent himself. On September 25, 1995, the trial court denied this request. In support of his decision, the trial court noted that voir dire was underway, that Appellant had made no attempts to subpoena witnesses and that allowing Appellant to proceed pro se would necessitate another lengthy delay. (Judgment Entry, September 25, 1995).
This Court notes that Faretta v. California (1975),422 U.S. 806 established that a defendant in a state criminal trial has a federal constitutional right to represent himself without counsel if he voluntarily and intelligently elects to do so. Faretta, however, did not address the question as to when this right must be asserted other than noting that the exercise of the right must be in good faith and cannot be made merely to delay or obstruct the trial. Id. at 834, fn.36. Moreover, this Court knows of no reported Ohio Supreme Court or appellate cases that specifically address this issue (although one unreported case exists) and it appears to be one of first impression.
This issue was addressed by the Court of Common Pleas of Lorraine County. In McDonald v. State (1991), 62 Ohio Misc.2d 262, the trial judge ruled untimely a defendant's request to represent himself after meaningful trial proceedings had commenced while defendant was represented by counsel and therefore denied the request. Id. The trial court reviewed several cases from courts in other jurisdictions and, based on the reasoning in those cases, ruled that the defendant had waived his right to self-representation when he proceeded to trial with counsel. Id.
Ohio's First Appellate District reached a similar conclusion inState v. Reed (November 6, 1996), Hamilton Co. App. Nos. C-940315, C-940322, unreported. In Reed, the court held that the trial court was within its discretion when it denied a defendant's request to represent himself which was made after the prosecution's opening statement. See generally, State v. Overholt
(1991), 77 Ohio App.3d 111 (concluding that it was not an abuse of discretion to refuse defendant's request to appoint counsel after trial was underway where the defendant reiterated his desire to conduct his own defense on all occasions until near the close of trial)
This Court finds the dicta in Faretta, and the reasoning ofMcDonald and Reed to be persuasive. Examining the proceeding below in its totality, we find that once counsel had begun the voir dire examination of potential jurors, meaningful trial proceedings had commenced. Appellant thereby waived his right of self-representation in waiting until this stage of the proceeding. It is clear from the record before us that Appellant's eleventh hour reinvocation of his right to proceedpro se would have resulted in yet another lengthy delay. There is no question that Appellant was not prejudiced in any way by the continued representation at trial by experienced defense counsel. The record before us is equally clear that the trial court provided Appellant fundamental fairness at every step of the proceedings and interpreted the rationale of Faretta in such a manner to facilitate the fair, impartial, speedy and sure administration of justice without the impediments of unjustifiable expense and delay. See Crim.R. 1 (B).
For the reason stated, Appellant's sole pro se assignment of error is hereby overruled.
Having addressed each of the assignments of error advanced by Appellant through counsel as well as by Appellant proceeding prose, we now shall undertake our own independent review pursuant to R.C. § 2929.05(A) and determine if the evidence presented at trial warrants the imposition of the death penalty. R.C. §2929.05(A), which sets forth the parameters of our independent appellate review, provides as follows:
 "(A) Whenever sentence of death is imposed pursuant to sections 2929.03 and 2929.04 of the Revised Code, the court of appeals and the supreme court shall upon appeal review the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. They shall also review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury or the panel of three judges found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors. The court of appeals or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case."
Thus, pursuant to R.C. § 2929.05 (A), an appellate court's independent review of the imposition of the death penalty involves a three-step process. First, we must review the record to determine whether the evidence supports a decision finding that the aggravating circumstance was established beyond a reasonable doubt. Second, we must reweigh all of the evidence presented at trial to determine if the aggravating circumstance outweighs the mitigating factors. Third, we are required to decide if the imposition of the death penalty in this case was disproportionate or excessive in comparison to other cases in our judicial district where the death penalty has been imposed. Statev. Steffen (1987), 31 Ohio St.3d 111; State v. Smith (1997),80 Ohio St.3d 89.
In addressing the first step of our independent review, we note that the sole specification under each of the two aggravated murder counts charged Appellant with the aggravating circumstance articulated in R.C. § 2929.04 (A) (5). Under this section of the Ohio Revised Code, criteria are defined which must be net prior to imposing the death penalty for aggravated murder. The statute states in relevant part:
 "(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
* * *
 "(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."
The indictment in this case reads as follows:
"COUNT ONE
 "The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County of Mahoning, on their oaths, and in the name and by the authority of the State of Ohio, do find and present that on or about the 3rd day of March, 1989, at Mahoning County, STEPHEN ALLEN VRABEL did purposely and with prior calculation and design, caused the death of Susan Clemente. In violation of Ohio Revised Code Section 2903.01 (A) (C) of the Ohio Revised Code, and against the peace and dignity of the State of Ohio.
 "SPECIFICATION ONE TO COUNT ONE
 "The Grand Jurors further find and specify that STEPHEN ALLEN VRABEL committed the offense of Aggravated Murder of Susan Clemente as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the said STEPHEN ALLEN VRABEL contrary to Ohio Revised Code Section 2929.04 (A)(5).
 "FIREARM SPECIFICATION TO COUNT ONE
 "The Grand Jury further finds and specifies that the said STEPHEN ALLEN VRABEL had a firearm on or about his person or under his control while committing the offense, contrary to and in violation of R.C. Sections 2941.141 and 2929.71 (A).
 "COUNT TWO
 "The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County of Mahoning, on their oaths, and in the name and by the authority of the State of Ohio, do find and present that on or about the 3rd day of March, 1989, at Mahoning County, STEPHEN ALLEN VRABEL did purposely and with prior calculation and design, caused the death of Lisa Clemente. In violation of Ohio Revised Code Section 2903.01(A)(C). against the peace and dignity of the State of Ohio.
 "SPECIFICATION ONE TO COUNT TWO
 "The Grand Jurors further find and specify that STEPHEN ALLEN VRABEL committed the offense of Aggravated Murder of Susan Clemente as part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the said STEPHEN ALLEN VRABEL, contrary to R.C. 2929.04 (A)(5).
 "FIREARM SPECIFICATION TO COUNT TWO
 "The Grand Jury further finds and specifies that the said STEPHEN ALLEN VRABEL had a firearm on or about his person or under his control while committing the offense, contrary to and in violation of R.C. Sections 2941.141 and 2929.71 (A)."
While Appellant has admitted that he killed both Lisa and Susan Clemente, the issue we must address is whether those killings were proven beyond a reasonable doubt to have been committed purposefully. R.C. § 2901.22 defines a purposeful act as an act which is carried out with a, "specific intention to cause a certain result."
The record reflects that Appellant went to the Miller Rod and Gun Store located on Poland Road, Youngstown, Ohio on March 3rd, 1989, and attempted to purchase a Jennings .22 caliber handgun. The sales clerk refused to sell the weapon to Appellant because his driver's license was expired. (Trial Transcript, p. 361). Appellant left and obtained a state issued identification card and returned to the store. Appellant purchased the weapon that he had been looking at earlier that day as well as a box of ammunition. (Trial Transcript, p. 361). The statement that Appellant gave to the Parma Police Department clearly illustrates the events that occurred when Appellant returned home:
 "On Friday, March 3, 1989 in the evening I was at my residence together with my wife Susan and my daughter Lisa. I had been drinking beer. I had retrieved (sic) my gun from the hallway closet and I was fumbling with it, with my hands. I had been standing in the hallway between the kitchen and living room. Then Lisa came walking past the hallway. Sue then entered into the kitchen and I shot her with the gun. Lisa was freaking out so I shot Sue again so that she wouldn't suffer. Lisa was freaking out and I hugged her and I was thinking, her mother is dead and her father is going to be in prison so I shot Lisa in the head, and she died instantly.
 "Q: Can you describe the gun that was used in the incident on Poland Ave.
"A: A .22 cal Jennings long rife pistol.
"Q: How long have you owned the Jennings weapon?
"A: I bought it March 2nd or 3rd. It was March 3rd.
"Q: Where did you buy the gun at?
 "A: Miller's Rod Gun in either Youngstown, Boardman or Struthers.
"Q: Did you buy bullets with the gun?
 "A: At least a couple hundred. A lot of bullets. I don't know.
"Q: Why did you buy the gun?
 "A: I had been thinking about buying a gun a long time. I really don't know.
 "Q: How many bullets were in the gun at the time of incident on Poland Ave.?
 "A: It was fully loaded. It holds a clip, maybe five or six bullets.
"Q: Where did you load the handgun?
 "A: As soon as I had gotten home. Sometime in the early afternoon.
 "Q: Had there been any argument at the Poland Ave. residence prior to you purchasing the gun?
 "A: It must have been in the afternoon when I got the gun because my driver's license was expired and I had to get a state I-D card and bring in my birth certificate to get it. I did not have any argument before I purchased the gun.
 "Q: Had you either loaded or fired the gun you purchased prior to bringing it into your residence on Poland Ave.?
"A: No, I just had it in the box.
 "Q: You mentioned that you had been drinking beer on March 3rd. How much beer did you have to drink prior to the shooting?
 "A: I had not drank anything up to the time I had gotten the gun and it was about one, two or three in the afternoon.
"Q: Do you now have any idea why you shot Susan?
"A: I just don't know why.
 "Q: You stated that the reason you had shot Lisa was that after you had shot Susan that Lisa freaked out and you didn't want her to suffer without having a mother and with me in prison, is that correct?
 "A: Yes, but it doesn't make any sense. She (Lisa) could have stayed with my mother.
"Q: How many times did you shoot Susan?
"A: Twice.
"Q: How many times did you shoot Lisa?
"A: I just shot her once.
 "Q: Where is the gun that was used in the shooting at this time?
 "A: In the back seat of the Plymouth in a grey duffle bag which also has dirty socks.
 "Q: Why didn't you go to the police right away after the shooting?
"A: I don't know.
 "Q: Prior to the shooting of Susan, had you thought of shooting her?
"A: I must have. Why else would I have shot her.
 "Q: Was there anyone else with you at the time of the shootings besides Susan and Lisa?
"A: No.
 "Q: Is there anything else that you can tell me about the incident on Poland Ave. on March 3rd 1989?
"A: No.
 "Q: Have you read the preceding statement which you have given to me consisting of three typewritten pages and is it true to the best of your knowledge?
"A: Yes."
(State's Exhibit 1, Suppression Hearing, July 13, 1995).
There can be no question that the evidence before the jury during the guilt phase of the trial was more than sufficient to support the finding that Appellant acted purposefully; he intended to kill Lisa and Susan Clemente. There is no evidence or even a suggestion that Appellant acted on an impulse or that the killings were the result of an instantaneous eruption of events, a sudden passion or the product of provocation. The voluntary nature of Appellant's actions, demonstrated in his statement to the Parma police, supports beyond a reasonable doubt the conclusion that Appellant purposefully murdered Susan and Lisa Clemente as part of a course of conduct as defined and proscribed by R.C. § 2929.04 (A) (5).
Having determined that the aggravating circumstance was established beyond a reasonable doubt, this court now turns its attention to the second step of its independent review. We must now determine whether the aggravating circumstance of engaging in a course of conduct involving the purposeful killing of two people outweighs any mitigating factors established by Appellant. We note, however, that Appellant presented no evidence in mitigation.
R.C. § 2929.04 (B) sets forth a specific list of factors which must be considered in favor of the defendant if they are proven by the evidence:
 "(1) Whether the victim of the offense induced or facilitated it;
 "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion or strong provocation
 "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
"(4) The youth of the offender;
 "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudication's;
 "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
In addition to the foregoing factors, R.C. § 2929.04 (B) provides that the history, character and background of the defendant as well as the nature and circumstances of the offense can be weighed against the aggravating circumstance. An appellate court is not required to consider the nature and circumstances of the offense in favor of the defendant, however, and the Ohio Supreme Court has held that, when the facts of a specific case so warrant, the nature and circumstances of the offense can be cited as supporting the finding that the aggravating circumstance outweighs the mitigating factors. State v. Moreland (1990),50 Ohio St.3d 58, 69. (Emphasis added). Furthermore, the trial court need not give mitigating weight to an offender's history, background and character if it finds that those factors do not warrant such weight. State v. Green (1993), 66 Ohio St.3d 141,150.
We note that only the aggravating circumstances may be weighed against the mitigating circumstances. State v. Davis (1988),38 Ohio St.3d 361, 367-373. Further, the mitigating circumstances must be considered collectively and in the aggregate. State v.Dickerson (1989), 45 Ohio St.3d 206, 213, and all mitigating evidence must be considered. State v. Lawrence (1989), 44 Ohio St.3d 24,27.
As earlier stated there is nothing in the record specifically related to the nature and circumstance of the offense that would weigh in favor of mitigation. Additionally, the only two statutory mitigating factors which have any possible applicability and can be gleaned from our review is the third factor, dealing with a mental defect and the lack of appreciation for the criminality of the conduct and the fifth factor, pertaining to a lack of a prior criminal history. Both of these factors, however, even when viewed collectively and in the aggregate warrant only marginal weight in light of the record, here.
The affirmative defense of not guilty by reason of insanity was not established during the course of trial and this particular issue was never raised or addressed by Appellant at the mitigation hearing. Thus, we cannot find that the mitigating factor of mental defect is worthy of more than minimal consideration. While we do attach some weight to Appellant's lack of a prior criminal history, this weight is likewise minimal at best.
This Court finds that the aggravating circumstance outweighs the mitigating factors when reviewed in the aggregate beyond any reasonable doubt. This conclusion is further supported when viewed in light of the horrific nature and circumstance surrounding the offense. State v. Moreland, supra; State v.Stumpf (1987) 32 Ohio St.3d 95, 99-100. Based on the result of this weighing process we find that the death penalty is the appropriate sentence.
Under the final step of our independent review, we are required to determine if the imposition of the death penalty in the instant case is excessive or disproportionate in comparison to other capital cases decided by this Court where the death penalty was imposed. This court has previously rendered decisions in seven capital cases, only one of which can be deemed similar to the case sub judice.
In State v. Gerish (Apr. 22, 1999), Mahoning App. 92 C.A. 85, unreported, this Court affirmed the conviction and death sentence of a man convicted of killing his mother and an innocent bystander. Gerish has been our only instance where the multiple-murder aggravating circumstance articulated in R.C. § 2929.04 (A) (5) was the sole aggravating circumstance, as in this case.
In State v. Rosalie Grant (Nov. 9, 1990), Mahoning App. No. 83-CA-144, unreported, this court affirmed the conviction and death sentence of a woman convicted of the purposeful killing of her two children during an aggravated arson.
In State v. Hudson (May 29, 1993), Jefferson App. No. 88-J-40, unreported, the defendant had been convicted of the kidnaping and purposeful killing of another man. In that matter, Hudson and three others lured the victim from his home by telling him that a friend needed his help, then drove the victim to a remote area where he was beaten, stabbed and shot. On appeal, this court reversed Hudson's death sentence.
In State v. Eley (Dec. 20, 1995), Mahoning App. No. 87-CA-122, unreported, this court affirmed the death sentence of the defendant after his conviction on aggravated murder. The death penalty specification concerned the fact that the murder was committed during or immediately after the commission of an aggravated robbery. The defendant killed the owner of a grocery store during a robbery attempt committed with the assistance of an accomplice.
In State v. Palmer (Aug. 29, 1996), Belmont App. No. 89-B-28, unreported, this court affirmed the death sentence of the defendant after his conviction on two counts of aggravated murder with the death penalty specification that the murders were committed during the course of an aggravated robbery. The defendant and an accomplice murdered and robbed two victims leaving their bodies along a roadside.
In State v. Spivey (Jan. 13, 1997), Mahoning App. No. 89-CA-172, unreported, this court affirmed the death sentence of the defendant after his conviction of aggravated murder with the death penalty specification that the murder was committed during the course of an aggravated burglary, aggravated robbery and grand theft of a motor vehicle. Mr. Spivey broke into an individual's home, stabbed and brutally beat her to death before robbing the house and fleeing the scene in the victim's automobile.
In State v. Raymond A. Twyford, III (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported, the defendant and another man were convicted of the kidnaping, robbery and murder of another. Twyford had deceived the individual into believing that they were going hunting. The defendants mutilated the body of the victim before disposing of it. This Court affirmed Twyford's death sentence.
Although three of the above cases involve multiple murders, (i.e. Grant, Palmer, and Gerish), only Gerish involved the situation where the multiple-murder aggravating circumstances under R.C. § 2929.04 (A) (5) was the sole aggravating circumstance. Thus, we find that since only one of these cases is sufficiently similar so as to suffice for proportionality purposes, a meaningful proportionality review requires us to examine similar cases decided by the Ohio Supreme Court.
Since 1986, the Supreme Court has reviewed numerous death penalty cases where the multiple-murder aggravating circumstance under R.C. § 2929.04 (A) (5) was the only circumstance present. See State v. Brooks (1986), 25 Ohio St.3d 144; State v.Bedford (1988), 39 Ohio St.3d 122; State v. Sowell (1988),39 Ohio St.3d 322; State v. Lawrence (1989), 44 Ohio St.3d 24; Statev. Coleman (1989), 45 Ohio St.3d 298; State v. Moreland (1990),50 Ohio St.3d 58; State v. Combs (1991), 62 Ohio St.3d 278; State v. Williams (1996), 74 Ohio St.3d 569 and State v. Awkal (1996),76 Ohio St.3d 324.
Out of the above cases, the Supreme Court has affirmed the death penalties in all but one. In many of those cases, the defendant was either under significant emotional stress or lacked substantial capacity to conform his conduct to the law due to mental illness or defect, all of which would weigh in favor of mitigation. See Moreland and Awkal, supra. In addition, the defendants in Moreland and Awkal could point to troubled childhoods in an attempt to establish mitigating evidence.
In Lawrence, supra, the Supreme Court found that the mitigating factors outweighed the single multiple-murder aggravating circumstance and, therefore, vacated the death sentences. However, the mitigating factors in Lawrence included provocation, post-traumatic stress disorder arising to the level of diminished-capacity, a mitigating factor under R.C. § 2929.05
(B) (3), a severe depression following the death of the defendant's infant son, lack of a significant criminal history, the defendant's voluntary military service and care for his family. By way of comparison, the mitigating factors we have found to be alluded to in this case are virtually nonexistent.
Based upon the foregoing, we find that under R.C. § 2929.05
the death sentence imposed upon Appellant herein is not disproportionate to the penalty imposed in similar cases decided by the Ohio Supreme Court. Therefore, the death penalty was appropriate and the judgment of the trial court is affirmed.
Vukovich, J., Donofrio, J., concurs.
APPROVED:
 __________________________ CHERYL L. WAITE, JUDGE